A03A0241. BENSON v. McMILLAN et al.
(581 SE2d 707)

ADAMS, Judge.

Nora Benson appeals a judgment entered after a bench trial. Benson contends that the trial court erred in finding her liable for damages to her former employer and by deciding her claim on a promissory note was not timely. We find no error and affirm.

Less than ten days after resigning from Ultralite Enterprises, Inc. (Ultralite), Benson sued Ultralite and its president and sole shareholder, William McMillan, in magistrate court for breach of contract to obtain $7,500 in salary. Benson attached a demand letter dated October 25, 2000, to her complaint, in which she threatened legal action on a promissory note. The demand letter, which was not sent, sought $123,539.64 on the note. McMillan and Ultralite answered, counterclaimed, and moved to transfer the case to state court. Ultralite and McMillan counterclaimed for breach of fiduciary duty and negligence, fraudulent misrepresentation and concealment, and breach of contract. McMillan separately asserted two additional breach of contract claims relating to automobiles as well as claims for conversion, negligent damage to property, and a claim for quantum meruit "for substantial repairs and work at Plaintiff's residence."

After the case was transferred, Benson amended her complaint to add a claim for the balance purportedly due on the promissory note. She alleged that as of June 21, 2001, McMillan owed her $130,634.32.

On appellate review of a bench trial, the factual "[f]indings shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." OCGA § 9-11-52 (a). In bench trials, the judge sits as trier of fact and the court's findings are analogous to a jury's verdict and should not be disturbed if there is any evidence to support them.

*Comtrol, Inc. v. H-K Corp.*, 134 Ga. App. 349, 352 (2) (214 SE2d 588) (1975).

When so considered, the evidence established that Benson worked at Ultralite, a small company with only a few employees, for more than 15 years. Benson wrote nearly all of the company's checks and had complete access to its checking account. About halfway through her period of employment at Ultralite, Benson made a personal loan of $64,000 to McMillan who executed a promissory note to that effect on May 17, 1993. The note specified an annual interest rate of nine percent on the unpaid principal balance. Under the terms of the note, "Principal and accrued interest shall be payable UPON DEMAND WITH 60 DAYS WRITTEN NOTICE BY DEBTOR." The note required Benson to make a written demand for payment sent by certified mail to McMillan's address. Benson drafted the note and the accompanying security agreement.

McMillan testified that after the note, "[a]t that point I just pretty much handed over exclusive control of the financial end of the business." McMillan explained, "I basically turned over all the records and access to everything to her." He testified that "[o]nce she had the authority to handle the financial end, then she guarded that and kept that very much under her wing constantly." McMillan recalled that

> she kept the checkbook under her control to the extent of taking records home with her on those times when she'd leave the office. She would hide things and files in such a way it was very difficult to find them if anybody looked for them. So many of the financial records were not readily available and not where you would expect them to be.

After making the personal loan to McMillan, Benson decided to raise her salary at Ultralite to $65,000 per year. She justified the pay raise on the basis that "I told him in repayment I wanted to be equal owner with him in the company and to have an equal salary." She admitted that McMillan would not have agreed to increase her salary at Ultralite except for the personal loan. Benson's prior annual salary was approximately $45,000, but in 1996 it became $63,040, and in 1997, 1998, and 1999, it grew to $65,000. From 1996 through 1999, Ultralite paid Benson $258,040 in total salary, an increase of $78,040.

McMillan testified that Benson was in charge of preparing receivables, accounting for payables, writing checks, balancing the checkbook, budgets, and tax return preparation. McMillan testified that "I trusted her on all financial decisions," so much so that Benson interacted exclusively with Ultralite's outside accountants and "had

complete control of the financial records of the company." When asked, "[w]hose responsibility was it to file tax returns?" McMillan responded, "[u]nquestionably hers." McMillan added that filing tax returns "was one of the specific duties that was assigned to her."

After Benson resigned, Noble, Ultralite's accountant for several years, was reluctant to discuss tax matters with McMillan because "[Noble] was led to believe that [Benson] was the owner and president of the company." McMillan testified that "I had to convince him that I had the authority to talk about financial matters of the company before he would talk to me." After Benson's departure, Noble told McMillan that Ultralite was behind in filing its taxes. To remedy the situation, Ultralite had to retain a forensic auditor to "come in and go through every document we had and find it from where it had been hidden away" to reconstruct Ultralite's financial history. McMillan testified that "all the financial records had been destroyed or removed or hidden or appeared to be that way."

At the close of Benson's case, McMillan moved for a directed verdict, pointing out that her case had a "fatal legal flaw," the absence of evidence of a proper demand for payment under the note. Benson argued that a demand letter was personally served as an attachment to the action in magistrate court. But, after further argument, and recognizing the notice problem remained uncured, Benson asked to dismiss the case.[1] The trial court agreed to hold the matter in abeyance and proceeded to hear evidence on the counterclaims.

Later, noting that Benson had "announced ready for trial, presented evidence, and then rested after the presentation of evidence," the trial court refused to allow a voluntary dismissal. Instead, the trial court treated the defendants' motion for directed verdict as a motion for involuntary dismissal that adjudicated her case on the merits under OCGA § 9-11-41. The trial court not only found that the notice problem precluded her claim but also that Benson failed to prove the merits of her claim. Noting that while Benson claimed no repayment had been made on the promissory note, the court found that the evidence "indicated that a substantial annual salary raise given by Plaintiff to herself in fact acted as a repayment for the loan. Said funds were paid by Defendant Ultralite Enterprises, Inc. to Plaintiff over a period of years and operated as a loan repayment."

The trial court awarded judgment to Ultralite and McMillan on all of the counterclaims except McMillan's claim for the repair of his automobile. Among its findings, the court determined that Benson

---

[1] At the bench trial on May 22, 2002, Benson's counsel admitted the demand was not made until April 8, so "[i]t's a matter of we've jumped the gun by ten days or [twelve] days."

negligently performed her work, and "failed to properly maintain the corporation's tax data and failed to report when tax data was lost or missing, thereby breaching [her] duties." Observing that Benson's negligence had caused Ultralite to incur expenses of $10,000 for a forensic accounting and $995 to retain a tax attorney, the trial court awarded those amounts to Ultralite. The court directed Benson to sell a certain 1973 Mercedes Benz vehicle in a commercially reasonable sale within 30 days of entry of the judgment and specified that she could retain only $4,150 of the proceeds.

1. Benson contends that the trial court erred in finding that she violated a duty to Ultralite to perform without negligence. She denies that she owed a fiduciary duty to Ultralite or that she breached it. Pointing out that she was not a certified public accountant, she characterizes her employment "as secretarial in nature." She faults McMillan for not backing up the computer information and for failing to take the necessary data to Ultralite's CPA before it was lost.

As Benson correctly notes, an employer-employee relationship does not typically create a principal-agent relationship. See *Physician Specialists in Anesthesia v. Wildmon*, 238 Ga. App. 730, 732 (1) (a) (521 SE2d 358) (1999). Nevertheless,

[a]ny relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

OCGA § 23-2-58. Further, "although some confidential relationships are created by law and contract (e.g., partners), others may be created by the facts of the particular case." *Cochran v. Murrah*, 235 Ga. 304, 306 (219 SE2d 421) (1975). "Generally the relationship between an employer and employee is that of arms-length bargaining. This is not to say, however, that under a particular fact situation a confidential relationship can never exist between an employer and his employee (e.g., an employer signing checks prepared by his secretary-bookkeeper)." Id. at 307. Whether a confidential or fiduciary relationship exists is a matter for the factfinder to decide. See *Hanson v. State*, 232 Ga. App. 352, 354 (2) (b) (501 SE2d 865) (1998).

Under general tort law, "[w]hen trust or confidence is reposed in a person in consideration of the payment or promise of reward to him, negligence in the person trusted which results in injury to the other person shall give the injured party a right of action." OCGA § 51-1-19. Here, Ultralite alleged that Benson breached a fiduciary

duty and presented evidence to support its claim. Although the trial court's order did not use the phrase "confidential relationship" or "fiduciary duty," the court repeatedly used the words "duty," "duties," and "negligence." Evidence showed that Ultralite, a small company, entrusted Benson with significant financial responsibility and authority. All documentation sent to Ultralite's CPA originated with Benson and documentation sent to Ultralite from its CPA was received by Benson. By her own admission, she was "probably three or four years" behind in preparing tax information, a fact which apparently was not conveyed to anyone at Ultralite. Benson, entrusted to act on Ultralite's behalf, apparently misled the company's CPA into believing that she was the owner and president of Ultralite. Other evidence showed that Benson signed tax documents on behalf of Ultralite in which she represented herself as the corporate secretary. When the computer "crashed," the data lost should already have been provided by Benson to Ultralite's accountant. Only after Benson resigned from Ultralite did the company's tax problems become known to McMillan, necessitating Ultralite to retain a CPA who specialized in forensic audits. Therefore, since the record contains evidence from which the factfinder could find that Benson held a confidential relationship with Ultralite and breached her duties to Ultralite, resulting in additional expenses attributable to that breach, we cannot say that the trial court clearly erred in finding Benson liable for those damages. See *Sam's Wholesale Club v. Riley*, 241 Ga. App. 693 (527 SE2d 293) (1999).

Notwithstanding Benson's claim to the contrary, holding her liable in tort does not violate public policy. Benson failed to cite any law applicable to these facts that would authorize a different outcome from the one reached by the trial court here.

2. Benson contends that the trial court erred in not limiting damages to the amount of her salary. She claims that even assuming she was at fault, since she was merely an at-will employee, the proper remedy was to terminate her employment. She argues that the mere failure to perform contract duties does not constitute a tort.

Benson's argument overlooks the obvious — Ultralite could not fire an employee who had already resigned her employment. Moreover, the trial court found that Benson violated a duty that apparently existed independent of contract, and the evidence supports this finding. Compare *ServiceMaster Co. v. Martin*, 252 Ga. App. 751, 756 (556 SE2d 517) (2001) (ineffective performance under a written contract, without more, does not give rise to a tort claim).

3. Benson contends that the trial court erred in "holding [her] liable in equity to [McMillan] for the sale of the automobile when [he] had unclean hands." She claims that McMillan was trying to hide this vehicle from his ex-wife in a divorce proceeding.

Benson failed to support these assertions with a single citation to the record. See Court of Appeals Rule 27 (c) (3) (i). We will not cull the record to search for evidence on her behalf. Moreover, the evidence shows that the original purchaser had agreed to sell the vehicle on behalf of McMillan for a commercially reasonable amount and, after obtaining a commission plus $2,500, provide the remaining proceeds to McMillan. Since McMillan proved that Benson had possession of the vehicle subject to the same terms, we cannot say that the trial court erred. See *Sam's Wholesale v. Riley*, 241 Ga. App. at 693-694.

4. Benson contends that the trial court erred by involuntarily dismissing her claim on the note. Asserting that such a drastic penalty requires a showing of wilfulness, she claims that she did not wilfully deprive him of demand or notice. She also contends that she substantially complied with the process required for the demand.

After Benson rested, under OCGA § 9-11-41 (a), absent "permission and an order of the court," she could no longer voluntarily dismiss her case. The trial court refused permission, and instead, granted McMillan's motion for involuntary dismissal. A trial court's ruling made under OCGA § 9-11-41 (b) will not be disturbed if there is any evidence to support it. *Magnus Homes, LLC v. DeRosa*, 248 Ga. App. 31, 32 (1) (545 SE2d 166) (2001). Since the record contains evidence to support a finding that Benson failed to make a proper demand for payment under the note, that determination will not be disturbed on appeal. See *Hamil v. Stanford*, 264 Ga. 801, 802 (1) (449 SE2d 118) (1994).

*Judgment affirmed. Andrews, P. J., and Barnes, J., concur.*

DECIDED APRIL 30, 2003.

G. *Roger Land*, for appellant.
G. *Richard Stepp*, for appellees.